**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**MARCIA L. WALLACE,**

     **Plaintiff,**

**vs.**                                 **CIVIL ACTION NO. 1:17-CV-01218**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered February 9, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 16 and 18.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 16.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 18.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Marcia L. Wallace (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on May 13, 2013 alleging disability as of October 1, 2009 due to "Sjogren syndrome, rheumatoid arthritis, chronic pain, joint damage, and loss of strength in hands".[1] (Tr. at 165.) Her claim was initially denied on September 25, 2013 (Tr. at 78-82.) and again upon reconsideration on March 24, 2014. (Tr. at 88-94.) Thereafter, Claimant filed a written request for hearing on April 11, 2014. (Tr. at 95-96.) An administrative hearing was held on November 30, 2015 before the Honorable Anne V. Sprague, Administrative Law Judge ("ALJ"). (Tr. at 27-55.) On December 15, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 10-26.)

On January 20, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 8-9.) The ALJ's decision became the final decision of the Commissioner on January 3, 2017 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On February 8, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 11 and 12.) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and Memorandum in support thereof (Document Nos. 16 and 17.), and in response, the Commissioner

---

[1] In her Disability Report – Appeal, submitted on November 19, 2013, Claimant alleged that her "fatigue is worse. I go from having joint pain to kidney pain to stomach pain, loss of appetite", in addition, she stated that her "right shoulder [is] getting worse. [N]eck pain due to joint damage [is] getting worse." (Tr. at 187.) In a subsequent Disability Report – Appeal, submitted on April 11, 2014, Claimant asserted her conditions changed for the worse: "I feel horrible, I have other issues occurring on top of [Sjogren's] and Rheumatoid" and that her right arm was going numb, that her joints do not ache, as they "throb, pop, and grind. [I] need to have a lot of tests, no insurance." (Tr. at 208.)

filed a Brief in Support of Defendant's Decision. (Document No. 18.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 42 years old when the ALJ determined she was not disabled; she is a "younger person" as defined by the Regulations as of her alleged onset date of October 1, 2009 and throughout these proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 15.) Claimant is a high school graduate and completed training as a Certified Nursing Assistant. (Tr. at 34, 166.) She last worked for a few days in 2010 as a resident caretaker, assisting patients with dressing, bathing, feeding, and therapy. (Tr. at 34.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2014 ("DLI"). (Tr. at 15, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since October 1, 2009, the alleged onset date through her DLI. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: Sjogren's syndrome and inflammatory arthritis. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 4.) The ALJ then found that Claimant retained the residual functional capacity ("RFC") to perform light work through her DLI:

the claimant had the residual functional capacity to lift and carry no more than 20 pounds occasionally and 10 pounds frequently; stand and walk no more than six hours in an eight-hour workday, sit no more than six hours. She can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl, and pushing/pulling no more than occasionally with her right upper extremity. She can perform frequent (but not constant) handling with the right hand. She should avoid unprotected heights, and exposure to extremes of heat, cold, vibration, and respiratory irritants such as dust, chemicals, and fumes. (Id., Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing her past relevant work through her DLI. (Tr. at 20, Finding No. 6.) At the fifth and final step, the ALJ found that Claimant was 41 years old on the DLI, making her a younger individual (Id., Finding No. 7.); that she had at least a high school education and able to communicate in English; that the transferability of job skills was immaterial to the determination of disability because the Medical-Vocational Rules support a finding of "not disabled" and that based on her age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Claimant can perform. (Id., Finding Nos. 8-10.) The ALJ determined that Claimant had not been under a disability from October 1, 2009 through the DLI, December 31, 2014. (Tr. at 21, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ's decision is not supported by substantial evidence for several reasons. First, she contends that the ALJ failed to provide any explanation for discounting her subjective complaints by citing specific evidence in the record as required by the Regulations. (Document No. 17 at 12.) Fatigue is a sequela of Sjorgen's syndrome, one of Claimant's severe impairments, however, the ALJ did not discuss Claimant's fatigue and its effects when assessing the RFC. (Id. at 12-13.) Second, the ALJ did not provide references to the evidence that supported

her conclusions, or appreciate the reason why there were few treatment records was a result of Claimant's financial hardship, not that she did not require further treatment. (Id. at 13-14.) Finally, Claimant asserts that the ALJ's RFC assessment was determined without consideration of any of her non-severe impairments in contravention to the Regulations. (Id. at 14.) Claimant asks the Court to find the ALJ's decision is not based upon substantial evidence and award Claimant benefits, or in the alternative, remand this matter for further proceedings. (Id. at 15.)

In response, the Commissioner contends that substantial evidence supported the ALJ's decision and she provided ample narration for this Court's deferential review. (Document No. 18 at 10.) Claimant's subjective symptoms contrasted sharply with the objective medical evidence of record, and the ALJ reconciled the conflict as per her duties under the Regulations. (Id. at 10-11.) The Commissioner points out that the ALJ noted that evidence from Claimant's own physician, Dr. Wassim Saikali, as well as from SSA medical examiner, Dr. Stephen Nutter, indicated none of the extreme functional limitations as alleged by Claimant, whose opinion was consistent with the two prior State agency physicians. (Id. at 11-12.) With respect to Claimant's allegations of debilitating fatigue and migraine headaches, the ALJ recognized that the medical evidence did not support them, and further, that Claimant denied such problems to her doctors. (Id. at 12-13.) The Commissioner argues that Claimant's subjective complaints were inconsistent with the overall record of evidence, which the ALJ acknowledged. (Id. at 13-14.)

In addition, the Commissioner argues that the ALJ's findings and conclusions were supported by ample evidence, and that the ALJ provided a thorough discussion as to which of Claimant's allegations she found credible and incredible and why, with specific citations to the medical records. (Id. at 14-16.) The ALJ recognized that Claimant did not make the same extreme

allegations of disabling conditions to her doctors, as opposed to the SSA. (Id. at 16.)

Contrary to Claimant's argument, the ALJ did not find that her impairments were eradicated, but based on her own statements to her treating physician, her symptoms were considerably improved with medication. (Id. at 16.) The ALJ properly assessed her RFC to accommodate Claimant's complaints of shoulder pain and diminished grip strength, limitations found by State agency physicians. (Id. at 17.)

Despite Claimant's lack of insurance coverage, the ALJ noted that Claimant saw Dr. Saikali at regular intervals, and she was able to obtain medications, to which Claimant responded well; the SSA sent Claimant for a disability evaluation with Dr. Nutter because of the thin evidence of record, who also found Claimant's physical condition was generally normal. (Id.) Regarding Claimant's argument that the ALJ neglected to consider her non-severe impairments, the Commissioner points out that the ALJ listed her non-severe impairments, and after having found two severe impairments, went onward with the sequential evaluation process, further, Claimant made no demonstration of what additional functional impairments the ALJ failed to consider. (Id.)

Finally, the Commissioner states the ALJ's decision is supported by substantial evidence and asks this Court to affirm it. (Id. at 18.)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Wassim Saikali, M.D.:

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Claimant treated with Dr. Saikali, a rheumatologist, from February 2013 to October 2013. (Tr. at 356-367.) A treatment note dated February 7, 2013 indicated that Dr. Sharma referred Claimant to Dr. Saikali, however, Dr. Saikali had no prior records for review. (Tr. at 366.) Dr. Saikali noted a history of Sjogren's syndrome by serology and dry eyes and dry mouth. (Id.) Blood testing was ordered and Mobic and tramadol were prescribed for her joint pain, as Mobic did very well for her previously. (Id.) Dr. Saikali also recommended that Claimant increase her activity and stretching exercise. (Id.) A follow-up visit on May 1, 2013 indicated that although Claimant had a prescription for dry eyes and dry mouth, she had not been able to get those prescribed because she has not yet received her insurance card. (Tr. at 367.) She reported the Mobic and tramadol helped her arthralgia pain significantly, estimating that the arthralgia of her hands, hips, knees and feet had improved by 50%. (Id.) However, she continued to have arthralgia pain that worsened with activity. (Id.) A physical examination revealed that both hands had no hot, swollen joints, but slightly decreased grip strength of the right hand with degenerative changes of the second and third metacarpal joint, full range of motion of upper extremities, normal spine, intact hips, full range of motion of knees bilaterally, no ankle edema, and no rash noted. (Id.) She was assessed with Sjogren's syndrome and arthralgias; it was noted that her rheumatoid factor was elevated but thought to be secondary to the Sjogren's syndrome. (Id.) She was continued on medications. (Id.)

On July 1, 2013, Claimant returned to Dr. Saikali for a follow up of her possible Sjogrens. (Tr. at 358-359.) It was noted she had abnormal serology, dry eyes and dry mouth, but never had a lip biopsy because of insurance issues. (Tr. at 358.) She continued to complain of mild generalized aches and pain in the hands, knees, neck, shoulder and arms associated with stiffness and soreness. (Id.) She described the pain as dull and achy, and relieved by tramadol and Mobic.

(Id.) Her labs were noted to have recently shown that she was SS-a positive, rheumatoid factor positive, anti-CCP negative, and hepatitis C negative. (Id.) She was also negative for recent weight loss, fatigue, tiredness, weakness, fever, infection, shortness of breath, headache, dizziness, insomnia. (Id.)

During another follow up appointment on October 2, 2013, Claimant reported having been seen at the emergency room the previous week for swelling and pain in her left jaw line; she was diagnosed with parotiditis and started on amoxicillin, which improved her symptoms significantly. (Tr. at 360.) She complained of increased joint pain in hands and feet over the past month, and occasional swelling in her hands, but not on that date. (Id.) She described joint stiffness in the morning for at least an hour but that she seemed to improve throughout the day, and stiffness again in the evenings. (Id.) She reported taking Mobic and tramadol daily and "it does seem to help keep her functioning. She denies any functional limitations." (Id.) She denied having headaches, dizziness, chest pain, shortness of breath, abdominal pain, GI upset or changes in her urinary or bowel habits. (Id.) An examination showed mild swelling of the right wrist and degenerative hypertrophy of the knees bilaterally, with full range of motion of her upper extremities, normal spine and hips and no ankle edema. (Id.) She was encouraged to exercise regularly as tolerated. (Id.)

Bland County Medical Clinic:

Claimant established treatment at the Bland County Medical Clinic with an initial visit of February 9, 2015. (Tr. at 414-423, 491-496.) It was noted she was seeing Dr. Saikali for Sjogren's and that further testing was needed, however, she could not afford testing or medications; she last saw Dr. Saikali in March 2014, and her last prescription was from March 2014. (Tr. at 415.)

Claimant complained of increased joint pain and discomfort, with sharp burning pain beginning about one month prior, as well as swelling in her hands with stiffness for which she took over the counter Motrin with some relief. (Id.) Claimant reported having fatigue, shortness of breath, dizziness, ringing in ears, and sleep problems. (Id.) She was prescribed Mobic and tramadol, and advised to exercise. (Tr. at 416.)

A note dated March 9, 2015 indicated that Claimant was tolerating Mobic and tramadol well and had improved with restarting of those medications, with decreased pain in the lower extremities. (Tr. at 420.) She reported having increased pain in her right arm at night, and using Tylenol PM with good results. (Id.) She continued to have fatigue, shortness of breath, dizziness and sleep problems. (Id.) By June 15, 2015, Claimant reported having increased joint discomfort over the summer, and pain and tenderness with decreased range of motion were noted. (Tr. at 494-495.) She was positive for shortness of breath, dizziness, headaches, and sleep problems, but negative for fatigue. (Tr. at 494.) During a follow up visit on September 28, 2015, Claimant complained of sinus pain and pressure, increasing pain, as well as headaches and intermittent vertigo; she was out of tramadol and was unable to keep her appointment the prior week. (Tr. at 491.) She was assessed with sinusitis and prescribed medication; her other medications were refilled and instructed to follow up in four months. (Tr. at 492.)

State Agency Medical Examiner:

On September 12, 2013, Dr. Stephen Nutter provided an internal medicine examination of Claimant. (Tr. at 346-350.) Dr. Nutter observed Claimant to ambulate with a normal gait, that she appeared stable at station and comfortable in the supine and sitting positions. (Tr. at 347.) Lung fields were clear; she had no chest tenderness; and she was not short of breath with exertion or

when lying flat during the exam. (Tr. at 348.) Her cardiovascular exam was normal. (Id.) Dr. Nutter noted there was some pain in the left shoulder with strength testing, and that both shoulders, elbows, and wrists were nontender, with full range of motion. (Id.) An examination of her hands revealed no tenderness, redness, warmth, swelling or atrophy; Claimant could make a fist bilaterally, and despite a notable discrepancy between grip strengths when using the odynometer, Dr. Nutter noted Claimant could squeeze his hand with both of her hands equally as well, and rated her grip strength as equal and normal bilaterally. (Id.) Claimant could write and pick up coins with either hand without difficulty. (Id.) Range of motion of the joints in the fingers of both hands was normal. (Id.)

Claimant's legs evidenced no swelling or crepitus of the knees, ankles, or feet (Tr. at 349.) She could stand on one leg without difficulty; she had no hip joint tenderness, redness, warmth, or swelling. (Id.) Her cervical and lumbar spine examination was largely normal as well, with neither tenderness, nor muscle spasms noted. (Id.) Neurological examination confirmed full muscle strength, no atrophy, and well-preserved sensory function. (Id.) Claimant could walk on her heels and toes; she could perform tandem gait; and she could squat, albeit with knee pain. (Id.)

Dr. Nutter assessed rheumatoid arthritis and Sjogren's syndrome, chronic cervical and lumbar strain, although he found no evidence of rheumatoid arthritis, no rheumatoid nodules, capsular thickening, periarticular swelling or tophi, or ulnar deviation. (Id.) Despite her reports of problems with her back and neck, Dr. Nutter noted Claimant had some minimally decreased range of motion of the lumbar spine, with no pain or tenderness noted in the cervical or lumbar spine, and negative straight leg test. (Id.)

State Agency Medical Consultant:

On September 25, 2013, Dr. Curtis Withrow reviewed the record with the benefit of Dr. Nutter's report, and found that Claimant was capable of performing a range of light work despite her impairments, with limitations in pushing and pulling with the right upper extremity and accommodated some modest postural, environmental, and gross manipulation restrictions with the right hand. (Tr. at 60-62.) On March 8, 2014, Dr. Rogelio Lim affirmed Dr. Withrow's RFC. (Tr. at 72-75.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

At the time of the hearing, Claimant testified that she was 42 years old, 5'8" tall and weighed 112 pounds. (Tr. at 33.) She testified that she had been having trouble trying to gain or maintain weight primarily because of lack of appetite which she attributed to the Sjogren's, making her mouth dry where food does not taste good. (<u>Id</u>.) She stated her doctors recommended she take Biotene, a special mouthwash, and use eye drops to help with symptoms of dry mouth and eyes. (Tr. at 33-34.)

Claimant verified that her medical treatment had been significantly limited due to the lack of health insurance. (Tr. at 47.) Although she left work sometime in October 2009, the director of nursing begged her to return, so she went back to work, but it only lasted a few days. (<u>Id</u>.) She testified that she last worked in 2010 for a few days as a resident caretaker, providing personal care for patients, and stopped working "because I couldn't handle it." (Tr. at 34-35.) She explained, "I was tired, weak. And of course, the joint pain. I couldn't lift like I was." (Tr. at 35.) She testified that the fatigue had worsened since 2009 that she related to the Sjogren's and rheumatoid arthritis. (Tr. at 36.) She stated that she experiences pain in her joints, especially in her right hand, right

elbow, neck, and knees, which she rated an 8 out of 10. (<u>Id</u>.)

Claimant testified that sometime in 2007 through 2008 she was diagnosed with rheumatoid arthritis and Sjogren's and that she continued to work at the time. (Tr. at 37.) She had previously seen Dr. Saikali for these conditions, but was not seeing him anymore because she could not afford it. (<u>Id</u>.)

Claimant also testified to having pain in her lower back radiating down her right leg. (Tr. at 37-38.) She described her right leg problems as: "Well, it gives out on me sometimes because it will start with like a tingling like it's about to go to sleep, and it gets real weak, and it will give out on me. And then the ache comes." (Tr. at 38.) She testified that when she has those episodes she lies down and props up her legs and will do stretches that she learned through her prior courses of physical therapy. (<u>Id</u>.)

Claimant experienced headaches two to three times a week, lasting an average of 24 hours. (Tr. at 38-39.) She testified that she has had headaches lasting two to three days, where she would start vomiting and experience dizziness. (Tr. at 39.) She testified that she last saw a doctor for her headaches in 2010 in Dayton, Ohio, who called her headaches "complicated migraines." (<u>Id</u>.) Another doctor believed the migraines were from joint damage due to Sjogren's. (Tr. at 40.) Claimant takes Excedrin for her headaches now. (<u>Id</u>.) She testified that she spent about fifteen days in bed over the last month due to headaches. (<u>Id</u>.) She testified she also feels cold all the time, she cannot get warm, so she wraps herself in a heating blanket. (Tr. at 42.) She stated that her doctors have told her that this is due to rheumatoid arthritis. (<u>Id</u>.)

Claimant testified that she can fold clothes, sweep and dust, but she needs to sit down after a few minutes and take a break. (Tr. at 42-43.) She will leave the house for doctor's appointments,

and for anything else, if she absolutely has to. (Tr. at 43.) She does not visit her father in Bland County, Virginia, he usually visited her, "because he knows me driving, it hurts to hold the steering wheel." (Id.) She testified that during the day she goes from the bed to maybe the couch and just watches TV. (Id.)

Because of her pain, she stated she has a hard time focusing on anything else, and also had difficulty remembering things. (Tr. at 44.) She stated she is unable concentrate enough to read, although she enjoys word-finding puzzles, but she has to use her non-dominant left hand to do them. (Tr. at 45.) She cannot use her right hand because when grasping something, her whole hand "will start to, you know, get in a lot of pain, and then it goes up my arm to my elbow." (Tr. at 45-46.) She feels pain in every joint in her fingers on her right hand; the pain hurts so bad she cannot sleep, and her husband will cut up her food for her, since the last time she tried to use a knife, she cut herself. (Tr. at 46-47.)

She estimated she could stand comfortably for no more than ten minutes and could walk comfortably for possibly fifteen minutes, and she could sit comfortably for fifteen to twenty minutes. (Tr. at 44.) She estimated that in an eight-hour day she could stand "maybe two to three hours" total. (Tr. at 45.) Out of an eight-hour day, she estimated she could walk two hours and sit for two hours as well. (Id.) Claimant estimated that she could lift possibly 10 pounds, but not with her right hand, which she indicated hurt too badly to hold a pen. (Tr. at 48.) She stated that even after writing a few words her hand begins to cramp to the point that her writing becomes illegible. (Id.) She indicates that the difficulty with her right hand had reached that severity at the beginning of 2013. (Id.)

In response to questioning by the ALJ, Claimant stated that she could no longer drive

because holding the steering wheel and having to constantly switch positions in an attempt to get comfortable makes it difficult. (Tr. at 48.) She did not remember when she drove last, though admitted she made a five-minute trip one month prior. (Tr. at 49.) Her husband takes her wherever she goes. (Id.) Her source of income is from her husband, who is on Social Security disability due to "back surgeries and got cages and all kinds of stuff in his back." (Tr. at 30, 49.) Because of her pain, Claimant testified that her husband does the household cooking and grocery shopping as well. (Tr. at 43, 46-47.)

When asked why she waited so long to file, given her alleged onset of disability in October of 2009, Claimant stated, "I didn't want to file. I didn't want to admit that, you know, I had something to hold me back." (Tr. at 49.)

<u>Mike Hileman, Vocational Expert ("VE") Testimony:</u>

The VE identified Claimant's past relevant work as a nurse's aide and considered it semiskilled work at the medium level. (Tr. at 50.) When asked to assume a hypothetical individual limited to: lifting twenty pounds occasionally, ten pounds frequently; standing and walking six hours in an eight-hour day; sitting no more than six hours in an eight hour day; occasional climbing stairs, ramps, ladders, scaffolds, ropes, and balancing; occasional stooping, kneeling, crouching and crawling; occasional pushing and pulling with the right upper extremity; frequent handling with the right hand; avoiding concentrated exposure to unprotected heights, dangerous equipment, extreme heat and cold, vibrations, chemicals and fumes, the VE stated the hypothetical individual could perform unskilled work such as marker, ticket taker, and cashier II. (Tr. at 50-51.) The VE confirmed that the hypothetical individual would not be able to maintain employment if absent from work on average two days per month due to fatigue or pain. (Tr. at 51-52.) However, if the

hypothetical individual were limited to being on their feet two hours per day, the VE responded that then sedentary work would be available, including unskilled occupations such as addressing clerk, call-out operator, and assembler production worker. (Tr. at 52.)

In response to questioning by Claimant's attorney, the VE acknowledged that all of the positions that he had identified required frequent use of both hands, with the exception of the call-out operator, which allowed for occasional handling and fingering. (Tr. at 52-53.) The VE further testified that a combination of walking, standing and sitting for less than eight hours would eliminate jobs, as would a requirement tolerating a worker who was lying down part of the day, but also because it would be difficult to find an exact job that provided those exact hours. (Tr. at 53-54.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Claimant argues that the ALJ did not consider her subjective complaints, or simply discounted them, when she fashioned her RFC, specifically with regard to Claimant's fatigue; additionally, Claimant complains that the ALJ disregarded her non-severe impairments with respect to the RFC.

The RFC Assessment:

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. See Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

From the outset, the ALJ found that Claimant's "[a]ll other established impairments are

considered to be non-severe for purposes of this decision." (Tr. at 15, Finding No. 3.) The ALJ

then provided the following narrative:

> Records show the claimant had a January 2009 history of bilateral knee and ankle
> pain, with diagnoses of bilateral knee arthritis, likely meniscal injury/inflammation
> [Tr. at 335.]. She was given Tramadol, and Ace bandages to both knees. She had a
> history of rheumatoid arthritis and Sjogren's syndrome, but stated this pain felt
> "different." In January 2009 she was also treated for fibrocystic breast disease,
> status-post excision of an epidermal inclusion cyst [Tr. at 258, 310.]. In January
> 2012 the claimant was treated for pleuritic chest pain and upper respiratory
> symptoms. She reported being a current pack-a-day smoker with a history of
> emphysema, "but does not currently use breathing treatments" [Tr. at 281.]. On
> physical examination at this time, the claimant showed normal neck range of
> motion, no tenderness, good range of motion in all joints with no tenderness to
> palpation, no back tenderness, and no focal neurological deficits. She had negative
> chest x-rays.

(Tr. at 15.) The ALJ considered Claimant's other medical records from April 2013 concerning a

rash below her abdomen, from which a physical examination showed she was in no apparent

distress, clear lungs, and normal range of motion of her extremities. (Tr. at 16, 500.) Additionally,

the ALJ referenced Claimant's June 2013 medical records concerning her right breast cyst and

bilateral mammograms indicating no malignancy (Tr. at 16, 392.) as well as her September 2013

records regarding her "swelling just below her left ear with left ear pressure for one day." (Tr. at

16, 497.) With respect to Dr. Nutter's assessment for chronic cervical and lumbar strain, the ALJ

quoted his summation from the examination:

> The claimant reports problems with her back and neck. She had some minimally
> decreased range of motion of the lumbar spine. There is no pain or tenderness noted
> in the cervical or lumbar spine on today's exam. Straight leg raise test was negative
> for radiculopathy. There is a range of motion abnormalities of the lumbar spine as
> noted above. Deep tendon reflexes are brisk and the sensory and motor modalities
> are well preserved. There appears to be no evidence of weakness or root
> compression. There is no evidence of upper motor neuron lesion.

(Tr. at 17.) The aforementioned clearly indicates that the ALJ considered all Claimant's medically

determinable impairments, including those she found to be non-severe. Assuming *arguendo* that the ALJ failed to consider Claimant's non-severe impairments, the oversight would have been harmless error: the sequential evaluation continued beyond step two when she found Claimant's Sjorgen's syndrome and inflammatory arthritis were severe impairments, further, the undersigned agrees with the Commissioner insofar as Claimant makes no demonstration as to which non-severe impairment impacted her functioning or the omission of such prejudiced her claim. See, e.g., Cook v. Colvin, 2016 WL 5661348, at *9 (S.D.W. Va. Sept. 29, 2016) (internal citations omitted). Accordingly, the undersigned **FINDS** Claimant's argument that the ALJ failed to identify or consider her non-severe impairments in assessing the RFC lacks merit.

Evaluating Credibility, Pain and Other Symptoms:

Claimant's other argument with respect to the RFC is that the ALJ discounted her subjective complaints, specifically, the fatigue she experiences from her impairments. Claimant essentially argues that the ALJ failed to follow the requirements under 20 C.F.R. § 404.1529, SSR 96-7p, and SSR 96-4p in evaluating Claimant's credibility regarding her subjective complaints, resulting in a flawed RFC assessment. (Document No. 17 at 12-13.) Social Security Ruling 96-7p[3] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding

---

[3] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on December 15, 2015. See, SSR 16-3p, 2016 WL 1131509.

about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. It is important to note that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

Before discussing Claimant's subjective complaints, the ALJ reviewed the medical evidence. It was noted that Claimant received little treatment for Sjogren's syndrome and rheumatoid arthritis in 2012, and that Claimant began treatment for these conditions with Dr. Saikali in February 2013. (Tr. at 15, 366.) The ALJ acknowledged Dr. Saikali's finding "some tenderness over the right second MCP, 'but no other swelling'". (Tr. at 15-16, 366.) It was further noted that although blood tests and workups were needed, Claimant had to wait a couple of weeks

"for her Medicaid." (Tr. at 16.) However, by May 2013, the record indicated that Claimant reported that she was "at least 50% improved" with Tramadol and Mobic. (Id.) The ALJ expressly noted the medical evidence documented Claimant "denied any significant joint stiffness, but activity made arthralgias worse", and despite her complaints of increased right hand swelling in the mornings, on examination, there was no bilateral joint swelling. (Id.) There was also a "'slight' decrease of grip strength in the right hand'" with degenerative joint changes in the second and third metacarpal joint. (Id.) The ALJ further noted that Claimant exhibited no reduced range of motion of her upper extremities or in both knees, and that her spine and hips were normal. (Id.) Tests indicated an elevated rheumatoid factor, elevated sedimentation rate, elevated SSA antibody and SSB antibody, and negative ANA. (Id.)

Next, the ALJ reviewed the consultative examination provided by Dr. Nutter, who found Claimant exhibited a normal gait, comfort in both supine and sitting positions, nontender shoulders, elbows and wrists, no redness, warmth, swelling or nodules, and normal range of motion of both shoulders and elbows. (Id.) The ALJ noted Dr. Nutter also found that both of Claimant's hands revealed no tenderness, redness, warmth, swelling, atrophy, and she could make fists bilaterally. (Id.) Dr. Nutter's finding no Heberden's or Bouchard's nodes was also noted by the ALJ. (Id.) The ALJ also acknowledged Dr. Nutter's finding the "notable discrepancy between the two grip strengths when using the Odynometer", but that Claimant was able to squeeze Dr. Nutter's hand "equally well" with both hands, resulting in a grip strength being rated as equal and normal at "5/5 bilaterally". (Id.) In addition to exhibiting normal range of motion of the fingers on both of her hands, the ALJ acknowledged that Dr. Nutter observed Claimant could "write and pick up coins with either hand without difficulty." (Id.)

The ALJ also reviewed at length Dr. Nutter's examination of Claimant's lower extremities, which was deemed normal, save for "knee pain with squatting." (Tr. at 17.) It was also noted that Dr. Nutter found Claimant "had some minimally decreased range of motion of the lumbar spine" though without "pain or tenderness noted in the cervical or lumbar spine" during the examination. (Id.)

The ALJ then noted that the record indicated Claimant received little treatment for any conditions in 2014, but then established care at Bland County Medical in February 2015, after her DLI. (Id.) Again, Claimant's need for financial assistance was addressed, and her medications were restarted, but by June 2015, she complained of increased joint pain; however, the ALJ noted the records indicated that she was in no acute distress, and again prescribed medications with a three month follow up appointment. (Tr. at 17-18.) Finally, the ALJ considered the medical evidence of record, and determined that under the applicable Listings criteria, none of Claimant's impairments met the Listings. (Tr. at 18.)

Next, after having reviewed the medical evidence of record, *supra*, the ALJ properly performed the two-step process[4], and then proceeded to review Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms, beginning with Claimant's testimony that she "stopped working in 2010, because of tiredness, weakness, joint pain and fatigue." (Id.) The ALJ noted that Claimant testified that her Sjogren's syndrome made her mouth and eyes dry, that nothing helps during attacks, and that her fatigue had worsened over time. (Tr. at 19.) The ALJ also acknowledged Claimant's radiculopathy, pain in her right hand, elbow and

---

[4] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

neck; the ALJ also noted that Claimant stated, "she lies down, props up her legs, and does stretches to help the pain." (Id.) Additionally, the ALJ considered Claimant's testimony getting "2 – 3 headaches a week that last on average for 24 hours, but sometimes for 2 – 3 days at a time. The headaches cause her to vomit, and nothing helps. She is in bed with headaches about 15 days a month." (Id.)

Next, the ALJ discussed Claimant's testimony that she cannot work as a caregiver because it required her to be up and moving around; that she previously enjoyed "activities like taking karate, ride motorcycles, and play basketball with her boys" but "[n]ow, she can fold clothes, sweep and dust a little", and her son "has to carry the laundry downstairs, and bring it back." (Id.) The ALJ also addressed the fact that Claimant's husband, "who is disabled with back problems", cooks, does the grocery shopping, and takes her places, as she drives very little, and he has been taking care of her. (Id.) The ALJ discussed Claimant's testimony that she has difficulty remembering things, has difficulty focusing on anything else but her pain, as well as her estimations of how long she can stand, sit, walk, and how much she can lift with her left hand only. (Id.) The ALJ acknowledged that Claimant stated she "has pain in every joint, and uses her hands very little", that when she grasps things, she has pain that goes up to her elbow, that her husband cuts her food for her, and "[i]n early 2013 she could hardly use her right hand." (Id.)

Besides her hand issues, the ALJ noted that Claimant claimed she was in constant pain, every day and all day, and that she has pain in her whole body from rheumatoid arthritis and Sjogren's. (Tr. at 19, 177, 193.)[5] The ALJ noted Claimant sought relief from her pain with

---

[5] The undersigned notes that the ALJ references Claimant's statements taken from her Function Report and Personal Pain Questionnaire.

medication, heat, and soaking in a hot tub, although "the pain never goes away." (Tr. at 19, 172.) The ALJ also acknowledged Claimant stated that she has little strength, gets dizzy, that one day her kidneys hurt, the next day she will have stomach pain and vomiting. (Tr. at 19.) Her migraines can last up to forty-eight hours, and she must remain in bed with her eyes closed during the entire time. (Id.) The ALJ also noted that Claimant complained of breathing problems and sleep difficulties. (Id.) She must change positions from sitting to standing and constantly take breaks. (Id.)

As for Claimant's activities of daily living, the ALJ discussed that Claimant alleged shortness of breath just from getting dressed, that cooking is hard for her because of her hands and weakness, and caring for her hair is difficult because she cannot grasp a brush, or a razor for shaving. (Id.) She needs help doing household chores, such as laundry, vacuuming, the dishes, and only does minimal shopping; she will not leave the house when it is raining or below 70 degrees because the cold "worsens her bone pain." (Id.)

The ALJ noted that Claimant talks with family when they visit, or on the telephone, and every three months she will go and watch her son test in karate; her husband drives her to doctor appointments. (Id.)

After her review of Claimant's allegations of pain and other symptoms, including fatigue, the ALJ found that the records did not support the extreme limitations endorsed by Claimant. Although the ALJ acknowledged that Claimant had little treatment for her conditions because she had no insurance, the ALJ noted that the records generated during her alleged disability period did not indicate severe functional limitations: "[t]he records do not show the extreme problems with strength or grip"; "[t]hey do not show complaints of being almost bed bound for long portions of

each month, or being unable to tolerate temperatures below 70 degrees"; and though headaches are documented, there was no evidence that Claimant was "unable to function for up to four days, required to stay in bed." (Tr. at 19-20.) However, the ALJ recognized the functional restrictions Claimant alleged as found during the consultative examination. (Tr. at 20.) Importantly, the ALJ gave weight to the State agency consultants' opinions endorsed in Exhibits 1A and 3A, even though they were made up to two years prior, because they were consistent with the evidence at the time, "and no evidence since that time suggests any significant worsening of the claimant's condition." (Tr. at 20, 56-64, 66-76.)

In sum, the ALJ provided a lengthy narrative describing Claimant's subjective complaints, including fatigue, and compared them with the medical evidence, and found that her alleged functional limitations were not supported by the record. The ALJ reviewed what evidence was deemed more credible and why, and specifically cited the evidence that supported her conclusions. Moreover, though the ALJ herein gave a thorough review of the available evidence of record, assuming *arguendo* that the ALJ failed to consider every piece of evidence, such is not the standard, because the issue before the Court is whether the ALJ's decision is supported by substantial evidence, not if she mentioned a particular piece of evidence. See, e.g., Grubby v. Astrue, 2010 WL 5553677, at *6-7 (W.D.N.C. Nov. 18, 2010); Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005); Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000).

Contrary to Claimant's contention that the ALJ noted the lack of medical treatment detracted from Claimant's credibility, the ALJ actually just noted Claimant's reasons for the lack of treatment due to finances, and then reviewed what evidence was available to reconcile it with her allegations. Furthermore, Claimant has not demonstrated any prejudice from the ALJ's

25

acknowledgement of her lack of insurance coverage during the period she claimed to be disabled. Shineski v. Sanders, 556 U.S. 396, 409 (2009).

Though Claimant argues that her allegations support greater limitations than those found by the ALJ, however, in order for this Court to do so would necessitate a re-weighing of the conflicting evidence, which is beyond the scope of this judicial review. See Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). In accordance with this Court's duty to scrutinize the record as a whole in order to determine if the Commissioner's conclusions were rational, as noted *supra*, the undersigned **FINDS** that the ALJ's consideration of and resolution of Claimant's limitations and abilities were "rational", and complied with the applicable Regulations and Social Security Rulings regarding with the appropriate RFC.  Oppenheim v. Finch, 495 F.2d at 397.

Accordingly, the undersigned **FINDS** the Commissioner's final decision is based on substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 16.), **GRANT** the Defendant's request to affirm the decision of the Commissioner (Document No. 18.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of

objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: July 21, 2017.

Omar J. Aboulhosn
United States Magistrate Judge